**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| JAMES EDWARD BARBER, | |
| *Plaintiff*, | Case No. _____ |
| v. | **CAPITAL CASE – GOVERNOR TO SET EXECUTION TIME FRAME** |
| KAY IVEY, Governor of the State of Alabama, JOHN Q. HAMM, Commissioner of the Alabama Department of Corrections, TERRY RAYBON, Warden, Holman Correctional Facility, STEVE MARSHALL, Attorney General of the State of Alabama, and JOHN DOES 1-3, | **JURY DEMAND** |
| *Defendants*. | |

## COMPLAINT

1.      Plaintiff James Edward Barber brings this action against Defendants Kay Ivey, John Q. Hamm, Terry Raybon, Steve Marshall, and John Does 1-3 (collectively, "Defendants") pursuant to 42 U.S.C. § 1983 based on Defendants' violation of Mr. Barber's rights and privileges under the Eighth Amendment to the U.S. Constitution.

## PRELIMINARY STATEMENT

2.      In 2022, the State of Alabama made history. Not the good kind. Never before in America had a state botched an execution not once, not twice, but three times in a row. The failed executions lasted hours longer than intended as unqualified "medical personnel" repeatedly punctured the inmates with needles before resorting to other painful techniques in hopes of setting an intravenous ("IV") line.

3.      Two of the executions were eventually called off before midnight, but only after the inmates suffered physical and psychological trauma from their lingering deaths as the team

1

responsible for setting IV lines ("IV Team") in the execution chamber continuously tried but failed to carry out the executions. The third inmate died after the IV Team attempted to set an IV line for **three hours**, making his execution one of the longest in American history. An autopsy performed after the execution exposed several concerning issues which are currently being brought to light in litigation by the inmate's estate.

4.      The State's inability to carry out these executions in a constitutional manner has set off a firestorm of public attention and scrutiny, and has made headlines around the world.

5.      But rather than engage in a meaningful investigation into these repeated failures and implement policies to prevent them in the future, Defendants rushed through a perfunctory "investigation" that lasted only a few short months and that yielded no meaningful changes. In fact, the only significant change Defendants have made since botching the three executions has been to amend the relevant rules to **give themselves more time for executions**, which recent history portends will only prolong the suffering of future condemned inmates. Indeed, under the newly-amended Alabama Rule of Appellate Procedure 8(d)(1), the amount of time available for the Alabama Department of Corrections ("ADOC") to execute an inmate has changed from one day to an unlimited "time frame" set by the Governor. *See* Ala. R. App. P. 8(d)(1); *see also* Ex. A (Dec. 12, 2022 Letter from Governor Ivey to Alabama Supreme Court requesting amendment to Alabama Rule of Appellate Procedure 8(d)(1)).

6.      As Mr. Barber awaits the Governor's announcement of his execution date, all available evidence suggests that he will suffer the same grisly fate as the last three inmates that Alabama tried to execute. Based on the results of those three botched executions, and the fact that the problems causing those executions still remain in place, it is reasonably foreseeable that over the course of several hours, Mr. Barber will be punctured with needles all over his body by an

unqualified IV Team that repeatedly fails to establish IV access. Mr. Barber will be kept strapped to the execution gurney during this drawn out process while the IV Team makes increasingly invasive and painful attempts to establish IV lines for a potentially unlimited period of time. And Mr. Barber will feel the terror of knowing that the IV Team botched the last three executions, and that no meaningful effort has been made to fix the blatant issues plaguing ADOC's lethal injection protocol ("LI Protocol").

7.     Under these circumstances, attempting to execute Mr. Barber without first fixing the issues that derailed the prior executions violates the U.S. Constitution, and more specifically, the right to be free from cruel and unusual punishment under the Eighth Amendment. The LI Protocol leads to botched executions; the protocol has not been fixed despite the last three blunders; and Mr. Barber will likely be repeatedly punctured for hours with needles all over his body. This puts Mr. Barber in a substantial risk of serious harm.

8.     If Defendants were serious about ensuring that their LI Protocol complied with the Constitution, they would not have conducted an internal and cursory investigation, and then refused to disclose the results. To the contrary, Defendants would have made reasonable changes to the LI Protocol to address the underlying problems with the last three executions. For example, the updated LI Protocol would include clear, transparent standards requiring that the IV Team members be trained medical professionals who are qualified to set IV lines, rather than the meaningless requirement that IV Team members be "certified or licensed within the United States." *See* Ex. B, March 2023 ADOC Execution Protocol at 17. The updated LI Protocol would also include a time limitation for an execution attempt to ensure that the IV Team does not spend several drawn-out hours trying and failing to establish an IV, torturing Mr. Barber in the process.

9.      Yet the heavily redacted and extraordinarily vague LI Protocol that will supposedly govern Mr. Barber's execution confirms that none of these changes have been made. *See* Ex. B. The LI Protocol does not so much as mention ADOC's investigation, let alone reflect what that investigation uncovered or how the new protocol will prevent Mr. Barber's execution from being botched like those before him.

10.      Mr. Barber accordingly seeks to be executed by the readily available alternative method of a nitrogen hypoxia, and asks this Court for injunctive and declaratory relief to prevent ADOC from executing him by lethal injection.

## **PARTIES**

*James Barber*

11.      Plaintiff James Edward Barber, a citizen of the United States and resident of the State of Alabama, is an inmate at Holman Correctional Facility under Defendants' supervision and subject to execution under a State court judgment of conviction for capital murder.

12.      Mr. Barber is a deeply religious man who regularly exercises his faith while in prison. *See* The Atlantic, *What it Means to Forgive the Unforgivable* (May 25, 2023), *https://www.theatlantic.com/ideas/archive/2023/05/james-barber-alabama-death-row-forgiveness/674181/.*

*Kay Ivey*

13.      Defendant Kay Ivey, the Governor of Alabama at all times relevant to this Complaint, is sued in her official capacity.  Defendant Ivey resides in the Middle District of Alabama.

14.      In response to the recent spate of botched executions in 2022, Governor Ivey asked the Alabama Attorney General on November 21, 2022 to withdraw the then-pending motion to set an execution date for Mr. Barber, and further requested that the Attorney General not move for

any new execution dates for any death row inmates. Ex. C, Press Release, *Governor Ivey Orders Top-to-Bottom Review of Execution Protocol for Victims' Sake* (Nov. 21, 2022).

15.     Governor Ivey then ordered that ADOC undertake a "top-to-bottom review of the state's execution process." *See id*. ADOC's "review" lasted just a few months. During this short time period, Governor Ivey petitioned the Alabama Supreme Court to amend Alabama Rule of Appellate Procedure 8(d)(1) to change the amount of time available for ADOC to attempt an execution from one day to an unlimited period of time to be dictated by the Governor. *See* Ex. D. The Alabama Supreme Court granted this request. *See* Ala. R. App. P. 8(d)(1). Under the newly amended Alabama Rule of Appellate Procedure Rule 8(d)(1), Defendant Ivey is responsible for setting the "time frame" under which an inmate's sentence of death shall be carried out by the Commissioner of ADOC.

16.     On February 24, 2023, the ADOC Commissioner sent Governor Ivey a 1.5 page letter announcing that ADOC's "review" was complete and that it was "as prepared as possible" to attempt another lethal injection. Ex. E, Letter from Commissioner Hamm to Governor Ivey (Feb. 24, 2023).

17.     Within hours, Governor Ivey instructed the Attorney General to move for a new execution date for Mr. Barber. Ex. F, Letter from Governor Ivey to Attorney General Marshall (Feb. 24, 2023). The Alabama Supreme Court granted the ensuing motion and authorized the State to execute Mr. Barber "within a time frame set by the governor." *See* Ex. G, Order, *Ex parte Barber*, CC-02-1794 (Ala. May 3, 2023).

18.     The decision regarding Mr. Barber's execution "time frame" now rests solely with Defendant Ivey.

*Terry Raybon*

19.     Defendant Terry Raybon, Warden of the Holman Correctional Facility, is sued in his official capacity.  Defendant Raybon has been acting under color of law and as the agent and official representative of the Holman Correctional Facility and ADOC.

20.     Defendant Raybon is the statutory executioner of all Holman death row inmates. *See* Ala. Code § 15-18-82(c) ("The warden of the William C. Holman unit . . . shall be the executioner. In the case of execution by lethal injection, the warden . . . may designate an employee of the unit to administer the lethal injection.").

21.     Defendant Raybon plays a direct role in each execution that takes place at Holman. *See, e.g.*, Ex. B (March 2023 ADOC Execution Protocol) at 11 (Holman Warden reads the execution warrant and administers the lethal injection solution).  Defendant Raybon organizes the execution team. He is responsible for ensuring that, on the night-of an execution, the execution team does not violate any court order or Governor issued orders. *See id*. at 11. Defendant Raybon reads the execution warrant to the inmate being executed and administers the lethal injection. *See id*.

22.     Defendant Raybon is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for executions, and supervising the execution site during executions. Defendant Raybon also is responsible for protecting the constitutional rights of all persons incarcerated at the Holman Correctional Facility.

*John Q. Hamm*

23.     Defendant John Q. Hamm, Commissioner of ADOC, is sued in his official capacity. At all relevant times, Defendant Hamm has been acting under the color of law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

24.   ADOC is the state agency charged with the incarceration, care, custody, and treatment of all state prisoners, including prisoners sentenced to death. Ala. Code § 14-1-1.2.

25.   Defendant Hamm is the alternate statutory executioner of all death row inmates at Holman. *See* Ala. Code § 15-18-82(c) ("In the event of the death or disability or absence of both the Warden and Deputy, the executioner shall be that person appointed by the Commissioner of the Department of Corrections."). Moreover, Defendant Hamm is statutorily charged with providing the materials necessary to execute death row inmates. *See* Ala. Code § 15-18-82(b) ("It shall be the duty of the Department of Corrections of this State to provide the necessary facilities, instruments, and accommodations to carry out the execution.").

26.   Defendant Hamm must be present at Holman for each execution, and he is responsible for maintaining an open telephone line to the Governor and the Attorney General. *See* Ex. B (March 2023 ADOC Execution Protocol) § IX(H).

27.   Defendant Hamm is responsible for ensuring that all prisoners committed to the custody of ADOC are treated in accordance with the United States and Alabama Constitutions. He is also responsible for the development and implementation of the protocol and procedures governing the execution of death-sentenced inmates in Alabama.

28.   Defendant Hamm has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in Alabama. Furthermore, Defendant Hamm has the ability to remedy problems that arise due to ADOC's lack of adequate procedures.

29.   Defendant Hamm has the ultimate authority to determine whether and when ADOC will execute an inmate by nitrogen hypoxia rather than lethal injection.

*Steve Marshall*

30.     Defendant Steve Marshall, Attorney General of the State of Alabama, is sued in his official capacity. At all relevant times, Defendant Marshall has been acting under color of law and as the agent and official representative of the Attorney General's office.

31.     Defendant Marshall has the power, authority, and obligation to implement, interpret, and enforce Alabama state law, including Ala. Code. § 15-18-82.1, the Alabama Constitution, and the U.S. Constitution.

32.     Defendant Marshall initiates the execution process in Alabama by asking the Alabama Supreme Court to set execution dates for inmates sentenced to death. Defendant Marshall has the obligation and responsibility to withdraw motions to set an execution date  that  are unconstitutional, including when the conditions of the proposed execution are unconstitutional. He also has the obligation and responsibility to ensure that ADOC complies with all state and federal law, including federal court orders, during an execution.

33.     During each execution, Defendant Marshall is responsible for maintaining an open telephone line to Commissioner Hamm, who attends each execution. *See* Ex. B (March 2023 ADOC  Execution  Protocol) at 9.

34.     Defendant Marshall plays an active role in "clearing" the commencement of each execution. *See* Ex. H, News Release, Alabama Office of the Attorney General, *Alabama Attorney General Steve Marshall Statement on the Execution of Murderer Joe James* (July 28, 2022) ("Attorney General Marshall cleared the execution to commence at 9:04 p.m."); Ex. I, News Release, Alabama Office of the Attorney General, *Alabama Attorney General Steve Marshall Statement on the Execution of Murderer Matthew Reeves* (Jan. 27, 2022) ("Attorney General Marshall cleared the execution to commence at 9:05 p.m.").

*John Does 1–3*

35.    Defendants John Does 1–3 are members of the IV Team who set the two IV lines required for a lethal injection execution in Alabama.  They are sued in their individual and official capacities. On information and belief, one member of the IV Team is or was a physician, and two members of the IV Team are or were Emergency Medical Technicians ("EMTs"). On information and belief, no member of the IV Team has sufficient relevant medical expertise to set IV lines in a humane manner, and they knowingly and willingly subject condemned men to needless suffering due to their own incompetence. Because Defendants conceal the identities of the members of ADOC's IV team, they are named as Doe defendants.

## JURISDICTION AND VENUE

36.    Mr. Barber's claim arises under the Constitution and the laws of the United States, and the laws of the State of Alabama. This Court has federal question jurisdiction over those claims arising under the Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by Mr. Barber are enforceable under 42 U.S.C. § 1983.

37.    Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

38.    No administrative grievance is available at Holman Correctional Facility for Mr. Barber or other death-sentenced inmates to challenge the way in which Defendants have implemented Ala. Code § 15-18-82.1. Nor is any available to challenge Defendants' failure to correct the LI Protocol that has caused ADOC to botch its last three execution attempts.

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

*Mr. Barber's Criminal Sentencing and Appeals*

39.     In December 2003, Mr. Barber was found guilty of capital murder. The jury recommended by a vote of 11-1 that Mr. Barber receive the death penalty. The trial judge sentenced Mr. Barber to death.

40.     Following a direct appeal of his conviction and sentence, Mr. Barber unsuccessfully sought state post-conviction and federal habeas relief.

41.     Mr. Barber's state and federal appeals of his conviction and sentence were completed when the U.S. Supreme Court denied certiorari on March 21, 2022.

42.     In Alabama, lethal injection is the default method of execution. Ala. Code § 15-18-82.1(a).

43.     When Alabama added nitrogen hypoxia as an available method of execution in 2018, death row inmates were given a 30-day window in which to decide whether to elect nitrogen hypoxia as their method of execution. *See id.* at § 15-18-82.1(b). Because Mr. Barber did not elect nitrogen hypoxia during this 30-day window, ADOC will attempt to execute him by lethal injection.

*Mr. Barber's Proceedings in the Alabama Supreme Court*

44.     On August 5, 2022, the Alabama Attorney General first moved the Alabama Supreme Court to set Mr. Barber's execution date. *See* Ex. J, State's Mot. to Set Execution Date (Aug. 5, 2022).

45.     Mr. Barber filed his opposition brief on September 9, 2022. In that brief, Mr. Barber argued that it was not an appropriate time to set an execution date, as the State had not yet determined—nor taken any steps to correct—what went wrong in the botched execution of Mr.

Joe Nathan James, Jr. *See* Ex. K, Barber Opp. to State's Mot. to Set Execution Date & Mot. to Preserve Evidence of Execution Process (Sept. 9, 2022).

46.   This argument was prescient. Soon after Mr. Barber filed his opposition brief, ADOC went on to botch two lethal injection executions in quick succession: that of Alan Eugene Miller, on September 22, 2022, and that of Kenneth Smith, on November 17, 2022.

47.   A few days later, on November 21, 2022, the Attorney General moved to withdraw his motion to set an execution date for Mr. Barber. *See* Ex. L, State's Withdrawal of Mot. to Set Execution Date (Nov. 21, 2022).

48.   On February 24, 2023, after Defendants' short-lived "review" of Alabama's execution process, the Attorney General moved again in the Alabama Supreme Court for an execution date for Mr. Barber. *See* Ex. M, State's Mot. to Set Execution Date (Feb. 24, 2023).

49.   On March 31, 2023, Mr. Barber filed his opposition to that motion, arguing, among other things, that Alabama conducted a flawed investigation into its lethal injection protocol, and failed to disclose what if any changes it made to prevent future botched executions. Mr. Barber argued that the Alabama Supreme Court should not schedule an execution date until Alabama addressed these issues. *See* Ex. N, Barber Opp. to State's Mot. to Set Execution Date (Mar. 31, 2023).

50.   Mr. Barber also filed a motion for a stay, a motion for discovery into what deficiencies ADOC uncovered in its "investigation," and a motion to preserve evidence of his own execution. *See* Ex. O, Barber Mot. to Hold State's Mot. to Set Execution Date in Abeyance or Stay These Proceedings (Mar. 31, 2023); Ex. P, Barber Mot. to Compel (Mar. 31, 2023); and Ex. Q, Barber Mot. in the Alternative to Preserve Evidence of Execution Process (Mar. 31, 2023).

51.     On May 3, 2023, without issuing any written opinion, the Alabama Supreme Court summarily denied all of Mr. Barber's motions and granted the State's motion for an execution warrant. *See* Ex. G, Order, *Ex Parte Barber* (Ala. May 3, 2023) (denying Mr. Barber's motions); Ex. R, Order, *Ex Parte Barber* (Ala. May 3, 2023) (granting State's motion).

52.     The Supreme Court of Alabama entered an order, under the newly amended Alabama Rule of Appellate Procedure Rule 8(d)(1), authorizing the State to execute Mr. Barber "within a time frame set by the governor." Ex. G, Order, *Ex parte Barber*, CC-02-1794 (Ala. May 3, 2023).

*Alabama's Constitutionally Deficient Lethal Injection Protocol and Practices*

53.     A key component of the LI Protocol is establishing IV access.

54.     For a competent and trained medical professional, establishing IV access is a common medical procedure that should be accomplished within minutes.[1]

55.     Even in cases where the subject has a medical condition that makes establishing IV access more difficult, qualified medical professionals are generally able to complete the procedure in a few minutes—and certainly in no more than 30 minutes.[2]

56.     Multiple attempts to set an IV results in "increased and potentially significant pain."[3]

57.     The LI Protocol requires the IV Team to place two IV infusion devices in the veins of the condemned individual. Ex. B at 17.

---

[1] Emergency Nurses Association, *Clinical Practice Guideline: Difficult Intravenous Access* 3 (2018).
[2] Bernd A. Leidel et al., *Comparison of intraosseous versus central venous vascular access in adults under resuscitation in the emergency department with inaccessible peripheral veins*, 83 Resuscitation 40, 40 (2012); Emergency Nurses Association, *Clinical Practice Guideline: Difficult Intravenous Access* 3 (2018).
[3] J. Matthew Fields et al., *Association between multiple IV attempts and perceived pain levels in the emergency department*, 15 J. Vascular Access 514, 517 (2014).

58.    The LI Protocol authorizes two methods that the IV Team can use to establish IV access: "[t]he standard procedure," or "if the veins are such that intravenous access cannot be provided [redacted] . . . a central line procedure." *Id.* at 9, 17. The LI Protocol does not define "the standard procedure."

59.    The LI Protocol also does not include time parameters under which the IV Team must establish IV access, but only provides that "[i]f the execution is to be carried out by lethal injection, the IV Team will complete its task." *Id.* at 10.

60.    Time and again, ADOC's IV Team has been unable to complete this task without violating the constitutional rights of the condemned. The last three lethal injection executions under Defendants' watch have all failed as the IV Team has either been unable to make IV access after attempting to do so for hours, or has made IV access but only after rendering the condemned inmate unconscious.

61.    The first of these recent failures involved Joe Nathan James Jr. The IV Team repeatedly tried to access a vein on Mr. James for more than three hours, making his execution one of the longest in American history. The team eventually accessed Mr. James's veins, but only after he appeared unconscious.

62.    Shortly after Mr. James's botched execution, Defendants tried again—this time on Alan Eugene Miller. But this execution, and the one that followed shortly thereafter of Kenneth Smith, were both called off before midnight after the IV Team again struggled to establish IV access despite trying for hours.

63.     These well-documented failures under Defendants' watch generated significant public attention, and made Alabama the only state in recent history to halt an execution in progress.[4]

64.     To hear Defendants tell it, nothing unforeseeable—no accident, no mishap—led to the three botched executions last year. ADOC has been adamant that nothing went wrong in those attempts.[5] Yet these botched executions were the result of Defendants' deliberate decisions to proceed by methods they knew or should have known would be unsuccessful. And Defendants are now undertaking the same deliberate and intentional act to try to execute Mr. Barber with no regard for how much unnecessary pain it causes.

*The Botched Execution of Joe Nathan James, Jr.*

65.     The first of the three recent attempts occurred on July 28, 2022, when the IV Team took more than three hours to establish access to the veins of Joe Nathan James, Jr.[6]

66.     Mr. James was first strapped to the execution gurney shortly after 6:00 pm. He remained strapped to the gurney ***for the next three-and-a-half hours***.[7] As part of their efforts to establish an IV line, the IV Team punctured Mr. James's elbows, wrists, hands, and right foot with needles, and made multiple incisions in his left arm.[8] Mr. James was subjected to unnecessary pain and suffering after being repeatedly punctured with needles.[9]

---

[4] *See* The Associated Press, *Alabama pausing executions after 3rd failed lethal injection* (Nov. 21, 2022), https://apnews.com/article/alabama-executions-kay-ivey-fd61fdbef131c192958758ae43a8c34a.
[5] See USA Today, *'Veins Could Not be Accessed': Alabama Halts Man's Execution for Time, Medical Concerns* (Sept. 23, 2022), https://www.usatoday.com/story/news/nation/2022/09/23/alabamaalan-miller-execution-halted-medical-concerns/8088788001/ (Defendant Hamm stating that Mr. Miller's execution failed "due to the time constraints resulting from the lateness of the [prior] court proceedings"); *see also* The Atlantic, *Dead Man Living* (Oct. 2, 2022),
https://www.theatlantic.com/ideas/archive/2022/10/alabama-inmate-execution-alan-miller-671620/
[6] *See* Compl. ¶¶ 4, 58-67, *Estate of Joe James, Jr. v. Ivey et al.,* 2:23-cv-00293-SMD (M.D. Ala. May 3, 2023).
[7] *Id.* ¶¶ 60, 75.
[8] *Id.* ¶¶ 61-62.
[9] *Id.* ¶ 66.

67.     On information and belief, the IV Team also performed an illegal "cut-down," slicing through Mr. James's skin in order to expose the vein to set an IV line.

68.     On information and belief, the IV Team forcibly and illegally sedated Mr. James in order to place the necessary IV lines for the lethal injection execution.

69.     When ADOC officials eventually opened the public curtain to the execution chamber around 9:00 pm—over three hours after Mr. James' execution began—Mr. James appeared unconscious as a result of the forcible sedation. He was pronounced dead shortly thereafter.[10]

70.     Following the execution, ADOC confirmed that the reason for the delay was the IV Team's inability to establish IV access.[11]

71.     Mr. James's autopsy revealed that he "suffered a long death," that he had "pool[s] of deep bruising," and that he had a "cutdown"—an incision over a vein on his arm—that showed "the IV team was unqualified for the task in the most dramatic way."[12]

72.     On May 3, 2023, Mr. James's estate filed a lawsuit in the Middle District of Alabama asserting, among other things, violations of Mr. James's constitutional rights under the Eighth and Fourteenth Amendments. *See* Compl., *Estate of Joe James, Jr. v. Ivey et al.,* 2:23-cv-00293-SMD, Dkt. 1 (M.D. Ala. May 3, 2023).

73.     Discovery in that action will further reveal, beyond the facts that have already been made public, Defendants' inability to carry out executions by lethal injection in a constitutional manner.

---

[10] *Id.* ¶¶ 67-73.
[11] *Id.* ¶ 77.
[12] *See* The Atlantic, *Dead to Rights: What did the State of Alabama do to Joe Nathan James in the Three Hours Before his Execution?* (Aug. 14, 2022), https://www.theatlantic.com/ideas/archive/2022/08/joe-nathan-james-execution-alabama/671127.

*The Failed Attempt to Execute Alan Eugene Miller*

74.     Approximately two months after the botched execution of Mr. James, Defendants attempted on September 22, 2022 to carry out the execution Alan Eugene Miller, but failed due to "problems accessing Miller's veins to administer the lethal injection drugs." *Miller v. Hamm*, No. 2:22-CV-506-RAH, 2022 WL 16720193, at *1 (M.D. Ala. Nov. 4, 2022).

75.     On September 15, 2022, just days before Mr. Miller's botched execution, Defendant Hamm personally guaranteed in a sworn affidavit that ADOC was ready to carry out Mr. Miller's execution by lethal injection.[13]

76.     Defendants Raybon, Hamm, Ivey, and Marshall knew that it would be difficult to access Mr. Miller's veins in advance but chose to attempt the execution anyway.[14]

77.     During the execution attempt, Mr. Miller experienced "extreme pain and suffering, both physical and psychological, as execution team members repeatedly poked, prodded, and slapped various parts of his body for approximately 90 minutes to try to establish venous access." *Miller*, 2022 WL 16720193, at *1.

78.     The IV Team tried to establish IV access first in Mr. Miller's right elbow, then in his right hand, and then in his left elbow. All of these attempts were unsuccessful. The IV Team then tried to establish an IV line in Mr. Miller's right foot and then in his right inner forearm.[15] But these attempts were also unsuccessful.[16]

79.     Next, the IV Team made simultaneous efforts to establish IV access in Mr. Miller's left arm and right arm. Neither attempt was successful.[17]

---

[13] *See* Hamm Affidavit, *Miller v. Hamm*, No. 2:22-CV-506-RAH, Dkt. 59-1 (M.D. Ala. Sept. 15, 2022).
[14] *See* Sec. Am. Compl. ¶ 99, *Miller v. Hamm*, No. 2:22-CV-506-RAH, Dkt. 85 (M.D. Ala. Oct. 12, 2022).
[15] *Id*. ¶¶ 124, 126.
[16] *Id.* ¶¶ 113-21.
[17] *Id.* ¶¶ 127-29.

80.     ADOC staff then, without explanation to Mr. Miller, manually adjusted the execution gurney—to which Mr. Miller remained strapped—into an upright position so that Mr. Miller was hanging in the air. While hanging in this way, Mr. Miller felt pain and throbbing in the IV sites, and across his body, and noticed blood leaking out of some of the puncture wounds.[18]

81.     After roughly 90 minutes of punctures and prodding, Mr. Miller was finally informed that his execution had been called off. In the course of the botched execution, Mr. Miller experienced significant pain in his foot and his arms from the repeated attempts to access his veins.

82.     He continued to experience significant pain in his arms, as well as psychological trauma, for long after.[19]

*The Failed Attempt to Execute Kenneth Smith*

83.     Despite botching the execution of Mr. James via lethal injection, and despite being unable to execute Mr. Miller via lethal injection, Defendants attempted another lethal injection execution just a few weeks later—and again they failed.

84.     At 8:00 pm on November 17, 2022, ADOC guards strapped Kenneth Smith to the execution gurney.

85.     At about the same time—7:59 pm—the Eleventh Circuit stayed Mr. Smith's execution. ADOC's attorneys received direct notice of the stay order from the Eleventh Circuit, and Mr. Smith's attorneys also contacted ADOC's attorneys to inform them within minutes.[20]

86.     Despite knowing that the execution was stayed by court order, ADOC decided to proceed with the execution attempt. As a result, Mr. Smith was left strapped to the execution

---

[18] *Id.* ¶¶ 132-34.
[19] *Id.* ¶¶ 139-40, 145.
[20] *See* Sec. Am. Compl. ¶¶ 7-8, *Smith v. Hamm*, No. 2:22-cv-00497-RAH, Dkt. 71 (M.D. Ala. Dec. 6, 2022).

gurney for four hours, while the IV Team spent almost two hours inserting needles all over his body. *See id.* ¶¶ 8-11.

87.    In a last-ditch attempt to find a vein, the IV Team inserted a thick needle under Mr. Smith's collarbone. *Id.* ¶ 11. This failed too, though not before it caused "pain and agony" to Mr. Smith. *Id.*

88.    Eventually, Mr. Smith's execution was called off due to the IV Team's inability to set an IV line.

*Defendants' Short-Lived "Investigation"*

89.    In response to this spate of botched executions, Governor Ivey asked Attorney General Marshall on November 21, 2022 to withdraw then-pending motions in the Alabama Supreme Court for the execution dates of Mr. Miller and Mr. Barber, and further requested that the Attorney General not move for any new execution dates for any other death row inmates. Ex. C, Press Release, *Governor Ivey Orders Top-to-Bottom Review of Execution Protocol for Victims' Sake* (Nov. 21, 2022).

90.    Governor Ivey then ordered that ADOC undertake a "top-to-bottom review of the state's execution process." Ex. C. The ADOC Commissioner immediately agreed, stating that in his review, "[e]verything is on the table – from our legal strategy in dealing with last minute appeals, to how we train and prepare, to the order and timing of events on execution day, to the personnel and equipment involved."[21]

91.    Unfortunately, the subsequent review was shrouded in extreme secrecy, conducted by ADOC rather than an external, independent investigatory body,[22] and, based on all available

---

[21] See AL.com, *Gov. Kay Ivey Orders Moratorium on Executions in Alabama* (Nov. 22, 2023), https://www.al.com/news/2022/11/gov-kay-ivey-orders-moratorium-on-executions-in-alabama.html.

[22] Among the states that practice the death penalty, Alabama stands alone in its decision to investigate itself, with no transparency or accountability regarding the findings of the investigation. For example, the State

evidence, was utterly perfunctory. Even before the investigation commenced, Governor Ivey made clear that she did not think that ADOC bore any responsibility for the botched executions. Instead, she stated her belief that "legal tactics and criminals hijacking the system [we]re at play here." *See* Ex. C.

92.     ADOC's "review" of its death penalty protocol lasted a few short months. On February 24, 2023, the ADOC Commissioner sent Governor Ivey a 1.5 page letter announcing that ADOC's "review" was complete and that it was "as prepared as possible" to attempt another lethal injection. Ex. E, Letter from Commissioner Hamm to Governor Ivey (Feb. 24, 2023). Within hours, Governor Ivey instructed Attorney General Marshall to move for a new execution date for Mr. Barber. Ex. F, Letter from Governor Ivey to Attorney General Marshall (Feb. 24, 2023).

93.     In connection with their sham investigation, Defendants declined to interview witnesses with critical information about the three botched executions. Nobody from the State attempted to interview: (1) Dr. Joel Zivot, the doctor who supervised the independent autopsy of Joe Nathan James, Jr. and who concluded that Mr. James had been subjected to an illegal "cutdown" to expose his veins; (2) Alan Eugene Miller, who has detailed, intimate knowledge about what went wrong during his execution; (3) or Kenneth Smith, who, like Mr. Miller, could describe what went wrong during his attempted execution.

---

of Tennessee appointed a former U.S. Attorney to investigate its injection protocol after failures to test lethal drugs. *See* Office of the Governor of Tennessee, *Governor Lee Calls for Independent Review Following Smith Reprieve* (May 2, 2022), https://www.tn.gov/governor/news/2022/5/2/gov--lee-calls-for-independent-review-following-smith-reprieve.html. In another state—Arizona—the Governor halted all executions in February 2023, acknowledging that Arizona has a "history of mismanaged executions," and appointed a retired U.S. magistrate judge to conduct an independent investigation into the Arizona Department of Correction's lethal injection and gas chamber protocols. *See* Office of the Governor of Arizona, *Gov. Hobbs Appoints Judge David Duncan as Death Penalty Independent Review Commissioner* (Feb. 24, 2023), https://azgovernor.gov/office-arizona-governor/news/2023/02/governor-hobbs-appoints-judge-david-duncan-death-penalty.

94.     Meanwhile, this Court, Mr. Barber, and the public remain in the dark as to how Alabama has changed its lethal injection protocol to correct for its recent failures. If anything, the information available to date[23] strongly suggests that no substantive changes have been made and that Defendants plan to proceed with Mr. Barber's execution as though the last three executions attempts that caused severe harm to the condemned inmates and significant outcry and blowback from the public never occurred.

95.     Indeed, the following chart illustrates the insufficiency of the redacted protocol for the purpose of assessing whether ADOC is now capable of constitutionally carrying out a lethal injection execution after failing three times in a row:

| So-called changes mentioned in ADOC's letter to the Governor[24] | Explanation of those changes in ADOC's current redacted protocol[25] |
|---|---|
| ADOC's execution protocol now "aligns with the best practices in other jurisdictions." | None. |
| The Governor will now issue an order setting a "time frame" in which an execution can occur. | None. |
| ADOC will "add to its pool of available medical personnel for executions." | None. |
| ADOC will use "new equipment" in "future executions." | None. |
| ADOC has "conducted multiple rehearsals of [its] execution process . . . to ensure our staff members are well-trained and prepared to perform their duties during the execution process." | None. |
| ADOC will "update [its] rehearsal and training procedure to ensure that Department personnel are in the best possible position to carry out their responsibilities during the execution process." | None. |
| ADOC will have a "vetting process for these new outside medical professionals." | No explanation of who will be vetting outside "medical professionals," or what the vetting process will consist of. The only change in the protocol related to this topic is a new requirement that members of the IV team "be |

[23] *See* Ex. S, Email Chain Between Counsel for Mr. Barber and the Attorney General's Office (Mar. 27, 2023). *See also* Ex. B, March 2023 ADOC Execution Protocol; Ex. T, Redline of March 2023 ADOC Execution Protocol Against March 2021 ADOC Execution Protocol.
[24] *See* Ex. E, Letter from Commissioner Hamm to Governor Ivey (Feb. 24, 2023).
[25] *See* Ex. B, March 2023 ADOC Execution Protocol.

| | currently certified or licensed"—without any explanation of what certification or license these team members must possess. |
|---|---|

96.     Moreover, while Annex C of the LI Protocol vaguely asserts that the execution team will be comprised of "more professionals" and that "members of the IV Team shall be currently certified or licensed within the United States,"[26] the LI Protocol never specifies *what entity* must certify or license the members of the IV Team or *in what specialty* members of the IV Team must be "certified or licensed."

97.     This is critically important because the IV Team members who have performed the last three executions have not been adequately trained or appropriately credentialed to establish IV access. And nothing in the LI Protocol suggests that those individuals will not be involved in Mr. Barber's potential execution or in future executions.

98.     Mr. Barber therefore finds himself in an uniquely cruel situation. He will be strapped to a gurney for a prolonged period of time and subjected to medical procedures by an IV Team that lacks the training and skill necessary to accomplish the tasks without imposing severe pain and suffering. Mr. Barber faces superadded terror and pain as a result of these extreme circumstances.

## CLAIM

### VIOLATION OF MR. BARBER'S RIGHT UNDER THE EIGHTH AMENDMENT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT

### AGAINST ALL DEFENDANTS

99.     Mr. Barber realleges and reincorporates by reference the allegations set forth in Paragraph 1-98 above.

---

[26] *See id.* at Annex C.

100.    The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII.

101.    The "cruelty" proscribed by the Eighth Amendment includes unnecessary pain or suffering gratuitously imposed by the government. *See Wilkerson v. Utah*, 99 U.S. 130, 136 (1878) ("[P]unishments of torture . . . and all others in the same line of ***unnecessary*** cruelty, are forbidden by that amendment to the Constitution.") (emphasis added); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) ("[T]he punishment must not involve the unnecessary and wanton infliction of pain.").

102.    Punishments are cruel and thus violate the Eighth Amendment when they involve a "lingering death," *Baze v. Rees*, 553 U.S. 35, 49 (2008), or the "super[adding]" of "terror, pain, or disgrace," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

103.    The Eighth Amendment does not prohibit pain in executions that results from an "isolated mishap," an "accident … for which no man is to blame … with no suggestion of malevolence." *See Baze*, 553 U.S. at 50 (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947) (concerning a one-time mechanical malfunction of an electric chair)). But the Eighth Amendment does prohibit what has become Defendants' regular practice—trying, again and again, a method of execution that they are not competent to carry out, inflicting severe and preventable pain on the condemned man in the process. *See id.* Mr. Barber's impending execution attempt by lethal injection is therefore an unconstitutionally cruel punishment.

104.    In each of the last three instances that the LI Protocol has been used, the executions ended in failure as Mr. James, Mr. Miller, and Mr. Smith each endured hours of countless punctures across their bodies as unqualified personnel attempted to establish IV access. This

resulted in extreme pain and suffering, both physical and psychological, as each hour that slowly passed during these drawn-out execution attempts contributed to a lingering death.

105.     Despite their repeated failure to establish IV access, Defendants have not instituted any known and meaningful safeguards to date. Nor have they undertaken any effort to ensure that the impending execution of Mr. Barber does not result in another prolonged, severely painful, and ultimately botched attempt. The key problems causing the repeated failures therefore remain in effect, which places Mr. Barber in substantial risk of serious harm.

*Unqualified IV Team Members for IV Access*

106.     Under the LI Protocol, IV Team members only need to be "certified or licensed within the United States." But the protocol is silent as to what type of certifications or licenses the IV Team members must possess, which certifying and licensing entities are acceptable, and who (if anyone) is responsible for verifying the accuracy of the certificates and licenses of the team members.

107.     On information and belief, the members of the IV Team that botched the executions of Mr. James, Mr. Miller, and Mr. Smith are or were EMTs. If the IV Team members continue to be EMTs, the generic requirement that they be "certified or licensed within the United States" does nothing to remedy the recurring problems with establishing IV access. Indeed, the EMTs that attempted to establish IV access failed the past three times they tried, and nothing in the LI Protocol suggests that the IV Team moving forward will be staffed with medical professionals that are better qualified to carry out the procedure.

108.     Other states with lethal injection protocols require that IV team members responsible for setting IV lines actually have a certificate or license to perform the particular procedure. For example, the protocol for the State of Arizona requires IV team members to be "certified or licensed" "to place IV lines," and further requires that the member's "licensing and

criminal history" be reviewed before the member is hired, in addition to the member's "qualifications, training, [and] experience."[27]

*Unqualified IV Team Members for the Central Line Procedure*

109.    The current protocol states that if the IV Team is having difficulty gaining IV access, "qualified medical personnel may perform a central line procedure," but there is no guidance for determining what medical personnel may be qualified.

110.    By contrast, the State of Florida's protocol specifies that only "an advanced practice registered nurse" or "physician or physician's assistant" licensed under Florida law is permitted to achieve and monitor central venous access.[28]

*No Reasonable Time Limit to Set an IV*

111.    There is no time limit to carry out the IV attempts under the LI Protocol. As a result, Mr. James's execution **lasted nearly 3.5 hours**, Mr. Miller's execution attempt lasted **around 1.5 hours**, and Mr. Smith's execution attempt lasted **nearly 2 hours**. The repeated punctures that these individuals endured across their bodies during this extended period of time contributed to the cruel nature of their executions.

112.    The current LI Protocol allows this practice to continue, which will likely lead to Mr. Barber being strapped to the execution gurney for hours, while an unqualified IV Team punctures him over and over again trying unsuccessfully to access his veins, superadding terror, pain, and disgrace to his death sentence.

113.    Other states' protocols include reasonable safeguards to ensure that the time to set IV access is not unnecessarily long. For instance, the protocol for the State of Louisiana provides

---

[27] *See* Arizona Department of Corrections' Lethal Injection Protocol (Amended April 20, 2022), Chapter 700, Order 710, Sections 3.2.5.1 & 3.2.5.2.
[28] *See* Florida Department of Corrections' Lethal Injection Protocol, Section 3(b).

that "if the IV Team cannot secure one or more sites within one hour, the Governor's Office shall be contacted by the Secretary and a request shall be made that the execution be scheduled for a later date."[29]

114.    The Arizona protocol similarly states that "[a]ny failure of a venous access line shall be immediately reported" to the director, who may later "stop the proceedings and take all steps necessary" before proceeding further.[30]

115.    Arizona's protocol also allows witnesses to observe the IV Team as they attempt to establish IV access, and likewise states that microphones in the execution chamber must be turned on throughout the execution so that witnesses can hear the IV Team members and inmate speak.[31] Alabama's LI Protocol does not provide the same.

*An Alternative Method of Execution is Available*

116.    Defendants can significantly reduce the substantial risk that Mr. Barber faces through the LI Protocol by executing him via a feasible and readily implemented alternative method execution: nitrogen hypoxia.

117.    In March 2018, Alabama added nitrogen hypoxia as an statutory execution method. *See* Ala. Code § 15-18-82.1(b). Nitrogen hypoxia is an execution method in which death is caused nearly instantaneously by forcing a person to breathe pure nitrogen. Nitrogen hypoxia does not require the setting of any IV lines, and therefore entirely avoids the medical procedure that the IV Team has proven itself incapable of performing.

---

[29] *See* Louisiana Department of Public Safety's Lethal Injection Protocol, Department Regulation No. C-03-001, Attachment E at Section J(2).
[30] *See* Arizona Department of Corrections' Lethal Injection Protocol (Amended April 20, 2022), Chapter 700, Order 710, Attachment D at Sections E(3) and E(5).
[31] *Id.* at Attachment D, Sections D(3) and D(6).

118.    Representatives for the State have for years, including in recent months, made representations to the media and to judges in the Middle District of Alabama that ADOC is very near ready to use nitrogen hypoxia as a method of execution. *See, e.g.,* Associated Press, *Alabama 'Close' to Finishing Nitrogen Execution Protocol* (Feb. 15, 2023) (Defendant Hamm telling the press that ADOC is "close" to finalizing its nitrogen hypoxia protocol, and nitrogen hypoxia should be ready for use by the end of 2023 at the latest) (https://apnews.com/article/crime-alabama-5818261f3209a332bb4badf280960ca1); *see also* Sept. 12, 2022 Hr'g Tr. at 7:12-15, *Miller v. Hamm et al.*, No. 2:22-CV-506-RAH (M.D. Ala. Sept. 12, 2022) (Assistant Attorney General James Houts explaining that ADOC has a gas mask ready to use in a nitrogen hypoxia execution); *see also id.* at 8:8 (Mr. Houts states, "the [nitrogen hypoxia] protocol is there."); *id.* at 6:24-7:4 (emphasis added) (Mr. Houts: "I will say if the Court enters a narrowly drawn, tailored injunction saying go forth only with nitrogen hypoxia, that it is ***very, very likely that Miller would be executed by nitrogen hypoxia.***" Court: "***On September 22nd***?" Mr. Houts: "***Correct***.").

119.    The Eleventh Circuit has twice held that nitrogen hypoxia is an available method of execution in Alabama. *See Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir. 2019) (per curiam) (holding that Alabama's statutorily authorized method of nitrogen hypoxia could not be considered unavailable simply because Alabama had not finalized a mechanism to implement the procedure); *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13781, 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022) ("We find that nitrogen hypoxia is an available alternative method for method-of-execution claims."). Late last year, the State petitioned the U.S. Supreme Court to grant a writ of certiorari to overturn the Eleventh Circuit's ruling that nitrogen hypoxia is an available method of execution in Alabama. *See John Q. Hamm, Comm'r, Ala. Dep't of Corr. v. Kenneth Eugene Smith*, Petition for a Writ of Certiorari, No. 22-580, 2022 WL

17885158 (U.S. Dec. 20, 2022). On May 15, 2023, the Supreme Court denied the State's request. *See Hamm v. Smith*, No. 22-580, 2023 WL 3440556 (U.S. May 15, 2023). The Eleventh Circuit's ruling that nitrogen hypoxia is an available method of execution in Alabama stands.

## JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

i. Permit expedited discovery, including document production and depositions, in light of Mr. Barber's forthcoming execution "time frame" of unspecified duration;

ii. Enter an injunction: (1) prohibiting Defendant Ivey from setting an execution "time frame" for a lethal injection execution; and (2) prohibiting Defendants from attempting to carry out an execution of Mr. Barber by lethal injection, and requiring Defendants to carry out the execution of Mr. Barber only by nitrogen hypoxia;

iii. Enter a declaratory judgment that Defendants' intent to execute Mr. Barber via their current lethal injection protocol would violate Mr. Barber's Eighth Amendment rights, and order instead that Defendants employ the readily available alternative method of nitrogen hypoxia execution;

iv. Require Defendants to maintain and preserve all evidence of their attempts to execute Mr. Barber, to prevent spoliation;

v. Such other and further legal and equitable relief as this Court deems just and proper.

Dated: May 25, 2023                              Respectfully submitted,

                                                 /s/ *Paula W. Hinton*
                                                 Paula W. Hinton (AL Bar No. 5586N77P)
                                                 Winston & Strawn LLP

800 Capitol St. Suite 2400
Houston, TX 77002
Tel: (713) 651-2600
Fax: (713) 651-2700
Email: phinton@winston.com

Kelly Huggins (IL Bar No. 6274748) (*pro hac vice* forthcoming)
Benjamin Brunner (IL Bar No. 6312432) (*pro hac vice* forthcoming)
Mara E. Klebaner (IL Bar No. 6323847) (*pro hac vice* forthcoming)
Stephen Spector (IL Bar No. 6333391) (*pro hac vice* forthcoming)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: khuggins@sidley.com
Email: bbrunner@sidley.com
Email: mklebaner@sidley.com
Email: sspector@sidley.com

Jeffrey T. Green (CA Bar No.: 141073, D.C. Bar No. 426747) (*pro hac vice* forthcoming)
Joshua Fougere (D.C. Bar No. 1000322, NY Bar No. 4805214) (*pro hac vice* forthcoming)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Email: jgreen@sidley.com
Email: jfougere@sidley.com

*Attorneys for Plaintiff James Barber*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed with the Clerk on this 25th day of May, 2023, and will be served on the following parties:

Kay Ivey
Office of the Governor of Alabama
600 Dexter Avenue
Montgomery, AL 36130

John Q. Hamm
Alabama Department of Corrections
301 South Ripley Street
Montgomery, AL 36130-1501

Terry Raybon
Holman Correctional Facility
866 Ross Road
Atmore, AL 36503

Steve Marshall
Attorney General's Office
501 Washington Avenue
Montgomery, AL 36104

/s/ *Paula W. Hinton*
Paula W. Hinton