# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

KENNETH EUGENE SMITH,    )
          )
        Plaintiff,    )
          )
v.          ) **Case No. <u>2:22-cv-00497-RAH</u>**
          )
JOHN Q. HAMM, Commissioner,    )
Alabama Department of Corrections,  )
*et al.*,          )
          )
        Defendants.    )

## <u>Affidavit of Dr. Boris Datnow, MD FCAP</u>

Before me, the undersigned notary, personally appeared Dr. Boris Datnow, who after being duly sworn did depose and say:

1.    I am an independent pathologist, licensed in the State of Alabama, my curriculum vitae is attached hereto as "Exhibit A."

2.    I conducted an autopsy on Joe Nathan James on or about August 3, 2022. I have not been retained by either party to this matter.

3.    During the course of the autopsy, I was assisted by Jay Glass.

4.    Dr. Joel Zivot, whom I understand to be an anesthesiologist, and Elizabeth Bruenig, a journalist for the Atlantic, were present as observers only.

5.      My findings from the autopsy are contained in the August 15, 2022 "Autopsy Report," which is attached hereto as "Exhibit B."

6.      A copy of my autopsy report was e-mailed to Dr. Joel Zivot on August 15, 2022.

7.      After reading an article in AL.com based upon the Atlantic's coverage of the autopsy I performed, I contacted Ivana Hrynkiw, a reporter for AL.com, to dispute the speculations contained in those articles. The resultant article is attached hereto as "Exhibit C."

8.      After publication of Exhibit C, I was contacted by Assistant Attorney General Richard Anderson by telephone on October 27, 2022. I had not been previously contacted by any other attorneys regarding the autopsy of Mr. James.

9.      As I explained to Ms. Hrynkiw, during the autopsy, I saw no evidence that a cutdown procedure was performed or attempted on Mr. James.

10.     Likewise, I saw no signs of a struggle, no excessive bruising beyond that typically found with intravenous access, no signs of excessive needle punctures, and no signs of torture or other abuse. I was able to positively identify only two needle punctures.

11.     Nothing in my autopsy, or in a toxicological screen of a sample of peritoneal fluid taken from Mr. James, suggested that Mr. James had been administered an intramuscular sedative.

12.     The speculations attributed to Dr. Zivot in the Atlantic article are his own. I was not given an opportunity to review or comment on the article prior to publication. Had the author done so, I would have commented that Dr. Zivot's speculations about torture, cutdown procedures, intramuscular sedation, and struggling by Mr. James are not supported by the autopsy I performed.

        Further affiant sayeth not.

                                                    _____
                                                    Dr. Boris Datnow, MD FCAP


Subscribed and sworn to before me on this the 2nd day of November, 2022.

_____
NOTARY PUBLIC

My commission expires_____5/7/23_____.

# Exhibit A

# CURICULUM VITAE

## Boris Datnow MD FCAP

1956-62      University of The Witwatersrand Medical School, Johannesburg, South Africa

1963           One year medical and surgical internship at Johannesburg General Hospital, Johannesburg, South Africa

1964-65      Assistant Professor, Department of Physiology, University of The Witwatersrand Medical School, Johannesburg, South Africa
General medical practicer including emergency room rotation

1966-67      Post doctoral fellowship, National Academy Sciences, Space Medical Research NASA AmesResearch Center, Moffett Field,California

1968-71      Residency in Anatomic and Clinical Pathology, Mayo Graduate School of Medicine, Rochester, Minnesota

1972           Dermatopathology Residency, Mayo Graduate School of Medicine, Rochester, Minnesota

1973           Associate Professor of Pathology , University Hospital Center, Sherbrooke, Quebec, Canada

1974-76      Associate Professor of Pathology, Department of Pathology, University of Alabama at Birmingham, Birmingham, Alabama

1977-82      Medical Director and Pathologist, Biomedical Reference Laboratories, Birmingham, Alabama

1983           Medical Director and Pathologist Southeastern Pathology Associates, Birmingham, Alabama

## Degrees and Certification

1957   Bachelor of Science
1962   MD
1972   Certification in Anatomic and Clinical Pathology , American Board of Pathology
1973   Fellow of American Board of Pathology
1983   Certified laboratory inspector-  College of American Pathologists

## Licenses

196   ECFMG Lisence

1972  FLEX  Licensure, Washington State

1973  Alabama State Medical License #6110

1973  Florida State Medical License #22301

1973  DEA  #FD0008804

## Professional Societies

Medical Association of The State of Alabama
Southern Medical Association
College of American Pathologists
American Society of Clinical Pathologists

# Exhibit B

**BORIS DATNOW MD FCAP**
2021 Brae Trail
Birmingham, Alabama 35242
mobile: 205 451 8523
e-mail: bodatnow@me.com

# AUTOPSY REPORT

August 15, 2022

**Decedent: James, Joe Nathan**          **Autopsy: 08/03/2022**
DOD: 7/28/2022
DOB: 7/25/1972

### POSTMORTEM EXAMINATION

   Authorization for unlimited autopsy has been properly completed and witnessed. The examination is performed  on August 2, 2022 at Abanks Mortuary Service, Birmingham, AL.  The body is identified by an identification band around the right wrist with the number "22ME02767" and the name "Joe James".

**EXTERNAL APPEARANCE:**  The body is that of a well developed, well nourished, un-embalmed Black male who appears the reported age of 50 years.  There is evidence of a previous autopsy with a coronal incision of the scalp and a Y-shaped thoraco-abdominal incision.  The body measures approximately 185 cm. In length and weighs approximately 260 pounds.  Eyes are autolyzed.  There are natural teeth in good dental repair.  Skin of the neck, chest and abdomen appears unremarkable with the exception of multiple tattoos.  No needle puncture sites are noted on the neck.  Upper extremities are symmetrical with multiple tattoos.  Present within the left ante-cubital fossa there are two needle puncture sites with a small amount of associated pink ecchymosis. Over the extensor surface of the left wrist there is a 3.0 x 1.0 cm. area of pink ecchymosis, however, a distinct needle puncture is not identified here.  There is focal superficial skin excoriation on the distal dorsal surface of the left hand.  On the

proximal flexor surface of the left forearm, immediately adjacent to the ante-cubital fossa, there are three transversely oriented and very superficial linear abrasions extending into the epidermis which each average 4.5 cm. In length.  The medial half of the most distal abrasion extends slightly deeper exposing dermis, however, no vascular or subcutaneous tissue structures are exposed here.  Lower extremities are symmetrical and free of edema and needle puncture sites.  The back is unremarkable.

**LUNGS:**  The right lung weighs 460 grams and the left lung weighs 420 grams.   Both organs present light purple-tan glistening pleural surfaces with minimal anthracotic pigmentation.  Pulmonary arterial trees are free of thrombo-emboli and the bronchial trees are unobstructed but contain a small amount of light tan thin frothy fluid.  The cut surfaces of both lungs reveals moderate congestion with a small amount edematous fluid expressed from the cut surfaces.  No consolidation or focal lesions are identified.

**HEART AND GREAT VESSELS:**  Residual heart tissue weighs 350 grams.  Epicardial surfaces are smooth and glistening.  Examination of the coronary arterial system reveals remaining portions of the major branches which are present to be widely patent.  Valvular components are thin and pliable and free of vegetation.  Endocardial surfaces are glistening.  There is no ventricular wall hypertrophy.  There is a dark red-brown homogeneous myocardium which is free of fibrosis and gross evidence of more recent ischemic change.  The ascending aorta is not dilated and demonstrates mild atheromatous deposit.

**LIVER:**  Light tan liver tissue is homogeneous and free of focal lesions.

**KIDNEYS:**  Residual kidney tissue presents a dark red brown coloration with smooth and glistening cortical surfaces.  No focal lesions are noted within well demarcated renal architecture.

**BRAIN:**  Residual brain tissue demonstrates normal architecture with well demarcated basal ganglia and cortex.  There is no evidence of softening, hemorrhage, discoloration or space occupying lesions.  Portions of cerebellum, pons and medulla appear grossly unremarkable.

# MICROSCOPIC

LUNGS: multiple sections of lungs are examined. There is venous congestion and pulmonary edema . The alveoli are lined by benign epithelium. The bronchi and bronchioles are lined by benign ciliated epithelium. In some lung feels there is focal fibrosis and anthracotic deposits.

HEART: sections of myocardium reveal normal myocardial muscle fibers. There are no pathologic changes

LIVER: sections reveal normal liver architecture. There are no pathologic changes

KIDNEYS: normal cortex and medulla. There are no pathologic changes

BRAIN: sections of cerebral cortex reveal normal brain tissue. There are no pathologic changes

**FINAL ANATOMICAL DIAGNOSIS**

1.    Reported history of state sanctioned chemical infused execution with:

      A.  Pulmonary congestion and edema.

      B.  Multiple needle puncture sites of upper extremities.

Boris Datnow, M.D.
Pathologist

Boris Datnow, M.D.
Pathologist

# Exhibit C

Contribute

Advertisement

News

# What happened to Joe Nathan James Jr. during Alabama execution? Doctors at autopsy disagree

Updated: Oct. 27, 2022, 7:50 p.m. | Published: Oct. 27, 2022, 6:30 a.m.



Generic photo of IV drip, not related to the case of Joe Nathan James. Photo via Getty Images. Getty Images

NEW!

By **Ivana Hrynkiw | ihrynkiw@al.com**

Standing in a room in north Birmingham, Dr. Boris Datnow prepared to find out what happened to a man recently executed by the state of Alabama. Everyone knew how it ended, but Datnow was set to do a second and private autopsy to shed light on what happened to the man just before he died, what his body looked like immediately after, and if there were any physical signs of contributing causes of death.

The doctor who did the autopsy has something to say. The problem is, it's different than what another doctor concluded.

The other doctor, Dr. Joel Zivot, an Atlanta-based physician and associate professor at Emory University, attended that private autopsy of Joe Nathan James, Jr. He just observed the procedure—didn't perform it—but said he believed Alabama sliced James' arm open in his final hours, trying to find a vein for the fatal three-drug cocktail to run through. The invasive procedure is known as a cutdown, and is occasionally used when traditional methods to find a vein don't work.

But Datnow, the autopsy pathologist performing the exam and creating the report, said that did not happen, that there's no question the three parallel marks on James' forearm are not the result of a cutdown.

Alabama's prison system has been in the national spotlight, as hundreds of inmates die each year inside the overcrowded facilities set to contain them, drawing criticism from the federal government. But the system more recently has drawn national headlines for its handling of executions. Experts and groups across the country have called multiple of the state's executions botched, for reasons ranging from the time it took to establish an intravenous line for the lethal injection, to a lack of transparency, to two men who weren't killed after attempts to prepare them for their executions failed.

Now, the reports of what happened to James are popping up in court filings in multiple other death penalty cases. Lawyers for other Alabama Death Row inmates are citing the second autopsy, arguing they don't want their clients to go through similar struggles or to suffer when it's their client's time to die.

In the case of Kenneth Eugene Smith, who is set to die on Nov. 17, his attorneys argued in a federal lawsuit that "impermissible means include(ing) cutdown procedures and intramuscular sedation" were used during James' execution.

Zivot, the Atlanta physician, worked with an England-based group called Reprieve to set up a second, private autopsy for James after his July 28 execution. They contacted Datnow, a Birmingham-based private autopsy pathologist, to perform the autopsy. Reprieve describes itself as "defend(ing) marginalized people who are facing human rights abuses, often at the hands of powerful governments."

The state autopsy was done prior to the independent one, but those results have not been made public. Datnow said he hasn't spoken with anyone involved in this case, aside from Zivot and Reprieve, and has not seen the state's autopsy report.

During the private exam, Zivot stood as an observer and noted several marks on James' arms, in addition to puncture marks and bruising. He's since been quoted in national press saying Alabama "tortured" the man in his final hours. But Datnow, the doctor performing the exam, said there is no evidence of a cutdown or "torture." Datnow wrote the final report of the exam's findings, and that report is clear as to Datnow's findings.

"If there's a cutdown, it's pretty damn obvious," said Datnow. "Of course, we would have seen that. Any first-year resident would have seen that."

Datnow contacted AL.com to dispute claims made by Zivot in the national press. "If it was there, I would have reported it," Datnow said. "There were no signs of a struggle."

Zivot, contacted for this article, stands by his assessment. He added that there would be no way to tell if a cutdown on James was successful—meaning, he isn't sure if that's how the state found a vein.

"Poorly done cutdown or well done cutdown, that's really beside the point isn't it?" Zivot said. He said the Alabama Department of Corrections and Alabama Attorney General's Office could release its autopsy to compare notes.

"If it was a poorly down cutdown or an unsuccessful cutdown, someone took a knife to his forearm. And that was not part of the protocol," Zivot said. "And why that was done, we don't know why."

"What we do know is it's not part of the protocol... There would be no reason to cut into his arm."

Datnow said he's disappointed that the cutdown claims have become part of the narrative of this execution. Lawyers who are citing the cutdown in unrelated federal lawsuits haven't ever called him to corroborate the claims. No one from the ADOC or Alabama Attorney General's Office has called him either, Datnow said. He hasn't been subpoenaed in any court case related to this exam.

The ADOC has never revealed the qualifications of the people who are tasked with setting up IV lines for executions.

James was 50 years old at the time of his execution, which happened at Alabama's William C. Holman Correctional Facility in Atmore on July 28. He was put to death for the 1994 slaying of his ex-girlfriend.

The statements about a cutdown being done on James come after the state admittedly spent hours searching for a vein to start an IV for his lethal injection. A cutdown would allow someone to surgically expose the vein and insert an IV directly, although Datnow says that did not happen.

Datnow said his final report includes no excess bruising, injuries, nor signs of a struggle or abuse. He added there were not an abnormal number of pinpricks or attempts to start an intravenous line. The bruising that was present, depicted in photographs, would be typical of a person who had undergone an attempt to set up in IV, he said. There were just two puncture sites on James' body, Datnow said.

"We have a detailed description of our findings," he said. "As far as we could see from an autopsy point of view, (there were) absolutely no signs of abuse."

The two pinpricks are not surprising, considering the redacted version of ADOC's execution protocol states there must be a backup line set up for every execution. An Oct. 21 filing by the Alabama Attorney General's Office in another case said, "to minimize the risk of unnecessary pain should an IV line infiltrate or become unusable, ADOC protocol provides for intravenous access at two different locations before lethal injection is administered."

Datnow, who is originally from South Africa but has lived in Birmingham for over four decades, reiterated that his job is to perform an examination and report the findings—nothing more. "You provide facts... not impressions," he said.

Zivot disputes Datnow's report that only notes two puncture wounds.

James' execution began around 9 p.m. that night, several hours after it was scheduled to begin. James' eyes were closed for the entire procedure, and he had no last words when briefly asked by the warden.

At 9:12 p.m., James appeared to stop breathing. The official time of death was 9:27 p.m.

ADOC Commissioner John Hamm did not provide a reason for the lengthy delay. When asked which process or part of the process was taking the extra time, he did not elaborate. He said James was not sedated, but the department later said they could not confirm that James was fully conscious when he was executed.

The following day, a prison spokesperson released the following statement: "ADOC's execution team strictly followed the established protocol. The protocol states that if the veins are such that intravenous access cannot be provided, the team will perform a central line procedure. Fortunately, this was not necessary and with adequate time, intravenous access was established."

Hamm said at the time, "We're carrying out the ultimate punishment.... and we have protocols and we are very deliberate in our process and making sure everything goes according to plan. So if that takes a few minutes or a few hours, that's what we do. So, there was nothing out of the ordinary, but we just made sure we carried out the court order."

The second autopsy was done at the request of Zivot and the James family. James' brother signed paperwork allowing the procedure to happen, and Reprieve paid for the exam. Datnow said the only person who has been given a copy of the report is Zivot; the family never requested a copy, nor did any attorneys for the James family or for the state.

Datnow's final report was finished on August 15. The report shows lethal injection as the cause of death, cited with pulmonary edema and multiple needle puncture sites. Both of those factors were expected, Datnow said.

Reprieve, who paid for the exam, issued a statement for this story. Reprieve US Director Maya Foa said, "There is no disputing that the autopsy report found Joe James' body covered in bruises, lacerations and puncture wounds consistent with repeated attempts to establish an IV line – none of which should be the norm for an execution or for a routine IV insertion. Alabama cannot continue to pretend that stabbing prisoners with needles for hours is in any way humane."

But Datnow said his report doesn't include excess bruises and lacerations.

There have been documented issues in starting an IV in at least three recent Alabama executions: The failed execution attempt of Doyle Lee Hamm in 2018, the controversial execution of Joe Nathan James Jr. on July 28, and the failed execution attempt of Alan Eugene Miller on Sept. 22.

Hamm has since died of cancer, and a judge has ordered state officials to preserve evidence from Miller's failed execution attempt.

Smith is set to die next month, also by lethal injection. While the Alabama Attorney General's Office denies that either a cutdown procedure or intramuscular sedation happened during James' execution, they agreed in Smith's federal lawsuit to "stipulate that such procedures will not be employed in the execution of Smith." The Alabama AG's Office also said in the same lawsuit that Smith's allegations all come "third-hand, being based on a press account of a second autopsy performed some days after James' execution."

*This story was corrected on Oct. 27 at 7:40 pm to show the autopsy report found three lacerations.*

If you purchase a product or register for an account through one of the links on our site, we may receive compensation.



**ADVANCE**
LOCAL

Registration on or use of this site constitutes acceptance of our User Agreement, Privacy Policy and Cookie Statement, and Your California Privacy Rights (User Agreement updated 1/1/21. Privacy Policy and Cookie Statement updated 7/1/2022).

**Cookies Settings**

© 2022 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

▷Ad Choices