IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES EDWARD BARBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:23-cv-342-ECM |
| | ) | (WO) |
| KAY IVEY, Governor of the State of | ) | |
| Alabama, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.  INTRODUCTION

Over twenty years ago, Plaintiff James Edward Barber ("Barber") murdered Dorothy Epps, a seventy-five-year-old woman, by beating her and striking her with a claw hammer.  Now, facing his imminent execution for committing this crime, he is before the Court arguing that his execution by lethal injection will violate the Eighth Amendment's prohibition against cruel and unusual punishment.  According to Barber, the State Defendants have demonstrated a pattern of difficulty accessing the veins of inmates during executions.  Barber asserts that he faces excessive needle punctures by the IV Team for the Alabama Department of Corrections ("ADOC") as they attempt to gain intravenous ("IV") access.

Barber brings a one-count complaint alleging that his impending execution by lethal injection violates his Eighth Amendment right to be free from cruel and unusual punishment.  The Defendants are Kay Ivey ("Ivey"), Governor of Alabama; John Q. Hamm

("Hamm"), Commissioner of the ADOC; Terry Raybon ("Raybon"), Warden of Holman Correctional Facility, where the execution is set to occur; Steve Marshall ("Marshall"), the Alabama Attorney General; and three John Does (collectively, "the Defendants").[1]  This matter is now before the Court on Barber's motion for preliminary injunction (doc. 25), wherein he seeks an order enjoining the Defendants from executing him by lethal injection. For the reasons that follow, Barber's motion is due to be DENIED.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  THE CURRENT STATE OF EXECUTIONS IN ALABAMA

Lethal injection is the default method of execution in the State of Alabama. ALA. CODE § 15-18-82.1(a).  Nitrogen hypoxia is an alternative method of execution in Alabama.[2] *Id.*  Death row inmates are afforded one opportunity to elect execution by nitrogen hypoxia.  Otherwise, an inmate waives the right to elect the alternative method and will be executed by lethal injection. ALA. CODE § 15-18-82.1(b)(2).

As support for his Eighth Amendment claim, Barber points to the Defendants' recent difficulty in establishing IV access to perform lethal injection executions.  Barber

---

[1]  Ordinarily, "fictitious party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (per curiam).  However, it may be appropriate when, as it is here, the plaintiff's description of the fictitious defendants is so specific that the parties may be identified for service of process. *See id.* (citing *Dean v. Barber*, 951 F.2d 1201, 1215–16 (11th Cir. 1992)).

[2]  Electrocution is also an alternative method of execution.

first highlights the July 28, 2022, execution of Joe Nathan James, Jr. ("James").  The U.S. Supreme Court denied James' motion to stay his execution shortly before he was strapped to the execution gurney after 6:00 p.m.  Attorney General Marshall did not clear the execution to commence until 9:04 p.m. due to difficulty in establishing IV access. (Doc. 1-8 at 2).  James was pronounced dead by lethal injection at 9:27 p.m. (*Id.*).

Two pathologists conducted autopsies on James' body after the execution.  A pathologist for the Alabama Department of Forensic Sciences ("ADFS") found evidence of "intravenous access to the medial left antecubital fossa and dorsum of the right foot, and additional needle puncture marks in the antecubital fossae, wrist, and hands." (Doc. 50-7 at 7).  The second pathologist found "no signs of excessive needle punctures, and no signs of torture or other abuse." (Doc. 35-1 at 3).  This pathologist "was able to positively identify only two needle punctures." (*Id.*).  Neither autopsy reported an intramuscular sedative found in James' body following the execution. (*Id.*).[3]

Barber also points to the next execution attempt by the Defendants on September 22, 2022.  The Defendants called off the execution of Alan Eugene Miller ("Miller") due to problems accessing Miller's veins to administer the lethal injection drugs.  At the time of his execution attempt, Miller weighed around 351 pounds, making venous access more

---

[3] Barber's complaint alleges there was evidence in James' autopsy of a "cut-down" procedure.  A cut-down procedure, which is not included in Alabama's lethal injection protocol, occurs when medical personnel slice through the skin of the condemned to expose direct access to a vein to set an IV line.  Allegations of a cut-down on James, however, are not borne out by either autopsy report.  The ADFS report noted "[l]inear superficial abrasions" on the "left antecubital fossa and proximal forearm," measuring only "1 ¾ inches in length and less than $1/_{16}$ inch in depth." (Doc. 50-7 at 6).  The second pathologist who conducted an autopsy on James concluded that he "saw no evidence that a cutdown procedure was performed or attempted on Mr. James." (Doc. 35-1 at 3).

difficult. (Doc. 50-20 at 2).  Like Barber, Miller filed a lawsuit prior to his scheduled execution asking the federal court to enjoin the Defendants from executing him by any method other than nitrogen hypoxia. (Doc. 50-10 at 1).  Around 9:00 p.m., on the day of Miller's scheduled execution, the U.S. Supreme Court denied this relief, permitting the execution to proceed. (*Id.*).  Miller was placed on the execution gurney around 10:15 p.m. (*Id.* at 2).  Medical personnel then began attempts to find a vein by puncturing Miller's "right elbow pit in multiple different spots." (*Id.*).  After failing to find a vein there, personnel attempted multiple punctures to his right hand, his left elbow, and his right foot. (*Id.* at 2–3).  A puncture in Miller's foot "caused sudden and severe pain . . . like [he] had been electrocuted." (*Id.* at 4).  After attempts at these spots failed, before midnight, the Defendants called off the execution.

On November 17, 2022, Alabama again tried lethal injection by IV, this time on Kenneth Eugene Smith ("Smith").  Smith also moved the federal court to enjoin the Defendants from executing him by lethal injection.  Minutes before his execution was to begin at 6:00 p.m., the district court denied his motion for a preliminary injunction. (Doc. 50-13 at 27).  The Eleventh Circuit reversed the district court, staying the execution at 7:59 p.m. (*Id.* at 28).  At 10:20 p.m., however, the U.S. Supreme Court vacated the Circuit's stay and permitted the execution to go forward. (*Id.*).  Shortly after 8:00 p.m., while the Circuit's stay was being reviewed by the Supreme Court, Smith was strapped to the execution gurney. (*Id.* at 33).  After the Supreme Court lifted the stay, medical personnel began attempts to find a vein to begin lethal injection.  They repeatedly punctured Smith's right arm and hand, causing pain. (*Id.* at 36–37).  Eventually, Smith's gurney was tilted

backward, bringing his feet above his head. (*Id.* at 37).  As attempts to find a vein failed, Smith reported that medical personnel began injecting an unknown clear substance into his neck area with a syringe. (*Id.* at 38).  They then attempted a central line procedure, which is in line with Alabama's execution protocol.[4] (*Id.* at 39).  Around 11:20 p.m., less than an hour after attempts to set an IV line began, the Defendants informed the media on-site that they called off the execution.

Following this second failed attempt to complete an execution by lethal injection, Governor Ivey asked Attorney General Marshall "to withdraw the state's two pending motions to set execution dates" so that the ADOC could "undertake a top-to-bottom review of the state's execution process." (Doc. 1-3 at 2).  One of these pending motions pertained to Barber's execution date.  On November 21, 2022, the State withdrew its motion to set Barber's execution date (doc. 1-12), and the ADOC began an internal review of its execution procedures.

On February 24, 2023, Commissioner Hamm informed Governor Ivey that the ADOC's review was complete "and that the Department is as prepared as possible to carry out death sentences going forward, consistent with the Constitution." (Doc. 1-6).  Governor Ivey asked Attorney General Marshall to move the Alabama Supreme Court to issue an execution warrant for an eligible death row inmate. (*Id.*).  He moved to set Barber's

---

[4]  Barber's expert witness testified at the evidentiary hearing that a central line procedure takes place when medical personnel enter into a larger vein in the torso and advance a longer catheter to the superior vena cava right before it enters the heart.

execution first. (Doc. 1-7 at 2).[5]  The Alabama Supreme Court granted the State's motion and ordered that Governor Ivey shall "set a time frame . . . within which the Commissioner of the Department of Corrections shall carry out James Barber's sentence of death." (*Id.*). Governor Ivey subsequently scheduled Barber's execution to be carried out within "a thirty-hour time frame . . . beginning at 12:00 a.m. on Thursday, July 20, 2023, and expiring at 6:00 a.m. on Friday, July 21, 2023." (Doc. 11-1).

Despite indicating that "[n]o deficiencies were found" by the ADOC's review "in Alabama's execution procedures," the ADOC made three meaningful changes to the method by which it attempted the three previous lethal injection executions. (Doc. 45-3 at 3).  First, the ADOC made a personnel change, replacing the members of the IV team who worked on past executions, noting that "[n]o person who will be responsible for setting IV lines during Mr. Barber's execution participated in any previous execution." (Doc. 45-3).  Second, Warden Raybon personally "participated in the interviews with candidates" from an expanded pool of medical personnel eligible to place the IV. (Docs. 50-27 at 1–2, 1-5 at 3). "As part of the interview process," Warden Raybon asked candidates "about their relevant experience, licenses, and certifications.  Candidates' licenses and certifications were reviewed at that time and ADOC verified that all were current.  The candidates selected all had extensive and current experience with setting IV lines." (Doc. 50-27 at 2).

---

[5]  Barber filed an opposition to the motion raising the same issues and making the same arguments as those he raises before this Court. (Doc. 1-14).  He also asked the Alabama Supreme Court to compel the State to produce information regarding its investigation and to hold the Defendants' motion in abeyance until "the State has had time to employ an independent third-party to investigate the failings of ADOC's lethal injection protocol." (Doc. 1-15 at 2).  Barber alternatively asked the Alabama Supreme Court to order the Defendants to "preserve evidence of any execution protocol used on Mr. Barber." (Doc. 1-17 at 5).  The Alabama Supreme Court denied all of Barber's motions. (Doc. 1-18).

As of June 29, 2023, Warden Raybon "re-verified that" the IV Team members' certifications and licenses "remain valid and current." (*Id.*).

A third meaningful change to Alabama's execution method permits the Governor to set an extended time frame to conduct executions. Compared to past execution attempts, the new time frame here essentially extends by six hours the window in which the State has to carry out Barber's execution. This extension is the result of the ADOC's review, which noted that "a single-day execution warrant that would expire at midnight . . . caused unnecessary deadline pressure for Department personnel as courts issued orders late into the night in response to death-row inmates' last-minute legal challenges." (Doc. 1-5 at 2). The extended time permits the medical personnel to set the IV without the time pressure caused by legal challenges on the execution date. Notwithstanding these changes, Barber argues that the ADOC's review was insufficient.

## IV. PROCEDURAL HISTORY AND BACKGROUND

A jury convicted Barber of "one count of capital murder for the killing of Dorothy Epps" on or about May 20 or 21, 2001, during a robbery or attempted robbery. *Barber v. State*, 952 So. 2d 393, 400 (Ala. Crim. App. 2005). Barber "knew Mrs. Epps during her lifetime, had done repair work at the Epps home, and had had a social relationship with one of Mrs. Epps' daughters." *Barber v. Comm'r, Ala. Dep't of Corr.*, 861 F. App'x 328, 330 (11th Cir. 2021), *cert. denied Barber v. Hamm*, 142 S. Ct. 1379 (2022). Evidence showed that Barber "struck Mrs. Epps in the face with his fist, and at some point thereafter, obtained a claw hammer that he used to cause multiple blunt force injuries to Mrs. Epps

which caused her death." *Id.*  The trial court followed the jury's eleven to one recommendation in favor of imposing a sentence of death. *Id.* at 329.

The Alabama Court of Criminal Appeals affirmed Barber's conviction and sentence. *Barber*, 952 So. 2d 393.  Thereafter, both the Alabama Supreme Court and the U.S. Supreme Court denied certiorari. *See id.* (noting the Alabama Supreme Court's denial of certiorari); *Barber v. Alabama*, 549 U.S. 1306 (2007) (mem.).  On March 8, 2019, a federal district court denied a habeas corpus petition filed by Barber pursuant to 28 U.S.C. § 2254. *Barber v. Dunn*, 2019 WL 1098486, at *54 (N.D. Ala. Mar. 8, 2019).  The Eleventh Circuit affirmed the denial, *Barber*, 861 F. App'x at 336, and the U.S. Supreme Court subsequently denied certiorari on March 21, 2022. *Barber*, 142 S. Ct. 1379.

Upon completion of Barber's post-conviction appeals, on August 5, 2022, Attorney General Marshall moved the Alabama Supreme Court to set Barber's execution date. (Doc. 1-10).  Barber opposed the State's motion. (Doc. 1-11).  However, on November 21, 2022, at the request of Governor Ivey, the State withdrew its motion to set an execution date. (Doc. 1-12).  After the ADOC's internal review, Attorney General Marshall again moved the Alabama Supreme Court to set Barber's execution date; Barber again opposed the motion. (Doc. 1-14).  On May 3, 2023, the Alabama Supreme Court permitted Governor Ivey to set Barber's execution, and she scheduled his execution to begin on July 20, 2023. (Doc. 1-7).

Barber filed this action on May 25, 2023, pursuant to 42 U.S.C. § 1983, alleging that execution by lethal injection violates his Eighth Amendment right to be free from cruel and unusual punishment. (Doc. 1).  Execution by lethal injection, as it currently stands in

Alabama, according to Barber, would cause superadded and unnecessary pain gratuitously imposed by the Defendants. (*Id.* at 22).  Barber alleges facts regarding the execution of James and the execution attempts of Miller and Smith to support his claim.  The ADOC's internal review, according to Barber, failed to "institute[] any known and meaningful safeguards" against "another prolonged, severely painful, and ultimately botched [execution] attempt." (*Id.* at 23).  In his complaint, due of the alleged risk imposed by lethal injection, Barber asks this Court to prohibit the State from executing him by any method other than nitrogen hypoxia. (*Id.* at 27).

Additionally, on June 5, 2023, Barber moved this Court to enjoin the State from executing him via lethal injection. (Doc. 25).  Barber does not seek a stay of his execution. Instead, he seeks an order from the Court enjoining his execution by any method other than nitrogen hypoxia.  The problem with this request is two-fold:  (1) Barber did not timely elect nitrogen hypoxia as his method of execution in compliance with Alabama law; and (2) the Defendants are not currently prepared to perform executions by nitrogen hypoxia. (*See* doc. 38-2 at 2).  Barber offers no authority for his request that the Court order his execution by a method he did not elect, and thus has waived, under Alabama law. *See* ALA. CODE § 15-18-82.1(b)(2).  Further, even if the Court were to order that Barber could only be executed by nitrogen hypoxia, such an order would effectively stay his execution for an indefinite period since the Defendants are not prepared to conduct executions by this method.  Thus, for all intents and purposes, Barber's motion for preliminary injunction operates as a motion to stay his execution.

## V.  DISCUSSION

Barber is entitled to a preliminary injunction only if he demonstrates that (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs the harm the injunction would cause the other litigants; and (4) if issued, the injunction would not be adverse to the public interest. *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014); *see also Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011).  Barber, as the movant, must, "by a clear showing," carry the burden of persuasion on all four requirements. *Hill v. McDonough*, 547 U.S. 573, 584 (2006); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion for each prong of the analysis." *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quotations and citation omitted).

The Court turns first to whether Barber can demonstrate a "substantial likelihood of success on the merits" of his underlying Eighth Amendment claim. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).  Barber alleges that he faces a substantial risk of serious harm if the Defendants are permitted to attempt to execute him by lethal injection.  Barber contends that he faces the risk that he will suffer "superadded pain" as the IV team attempts to gain venous access.  The manner in which the ADOC personnel are implementing the Lethal Injection ("LI") Protocol forms the basis of Barber's claim.

A.      **Statute of Limitations**

The Defendants maintain that Barber cannot establish a substantial likelihood of success on the merits because his claim is barred by the statute of limitations.  According to the Defendants, Barber challenges the LI Protocol itself, which has been in place for several years.  Because Barber did not file his complaint within two years of Alabama's adoption of the LI Protocol, the Defendants argue that his claim is barred by the statute of limitations.  On the other hand, Barber contends that his claim regarding the LI Protocol is not barred because the facts supporting his claim only became apparent in 2022 when the Defendants had difficulty establishing IV access in the past three execution attempts. Barber points to the execution of James and the execution attempts of Miller and Smith to support his assertion that the pattern of superadding pain only recently became clear.

A claim pursuant to § 1983 "is subject to the state statute of limitations governing personal injury actions." *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1153 (11th Cir. Jan. 30, 2023).  In Alabama, the applicable statute of limitations is two years. *Brooks v. Warden*, 810 F.3d 812, 823 (11th Cir. 2016); *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).  However, "federal law determines the date on which a cause of action accrues. In Section 1983 cases, the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Nance*, 59 F.4th at 1153 (quotations omitted).

In his complaint, Barber challenges aspects of the LI Protocol that fail to specify the requisite training and certification necessary for individuals to participate on the IV team. Barbour also alleges that the LI Protocol does not define the "standard procedure" for

11

establishing IV access. (Doc. 1 at 13).  He further alleges that the LI Protocol does not "include time parameters under which the IV team establish IV access." (*Id*.).  Barber also faults the LI Protocol because it does not specify "what *entity* must certify or license the members of the IV team or *in what specialty* members of the IV team must be 'certified or licensed.'" (*Id*. at 21) (emphasis in original).  According to Barber, "[t]his is critically important because the IV team members who have performed the last three executions have not been adequately trained or appropriately credentialed to establish IV access." (*Id*.).

To the extent that Barber challenges these aspects of the LI Protocol itself, his claims are barred by the statute of limitations.  For purposes of the statute of limitations, Barber's claim accrued when he had "a complete and present cause of action, that is, when [he could have] file[d] suit and obtain[ed] relief." *McNair*, 515 F.3d at 1174 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).  The alleged deficiencies in the LI Protocol about which Barber complains have been present since the last significant change in Alabama's lethal injection protocol, over two years ago.  Consequently, to the extent Barber claims that specific provisions of the LI Protocol violate the Eighth Amendment, those claims are barred by the statute of limitations.

To the extent that Barber asserts that the manner in which the LI Protocol is carried out—through an emerging pattern of prolonged attempts to establish IV access—violates the Eighth Amendment, this claim is not barred by the statute of limitations.  In his complaint, based upon the circumstances surrounding the executions of James and attempted executions of Miller and Smith, Barber alleges that it is "reasonably foreseeable that over the course of several hours, [he] will be punctured with needles all over his body

by an unqualified IV team that repeatedly fails to establish IV access." (Doc. 1 at 2–3).

Relying on the unpublished opinion in *Smith v. Commissioner, Alabama Department of Corrections*, Barber asserts that the "emergence of ADOC's pattern of superadding pain through protracted efforts to establish IV access" in the prior execution attempts is the fulcrum on which his claim rests. 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022).

The Eleventh Circuit has held that when, as here, a plaintiff pursues an "as-applied method-of-execution claim," the limitations period "does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Nance*, 59 F.4th at 1153 (quoting *McNair*, 515 F.3d at 1173). As the Eleventh Circuit held in *Nance*, to the extent that Barber brings an as-applied challenge to the LI Protocol, the statute of limitations has not expired because he could not have known until 2022 "his unique personal circumstances [that] would render his execution unconstitutional." *Id.* The facts Barber alleges in support of his as-applied challenge first emerged in 2022 after James' execution and the execution attempt of Miller. Thus, Barber's claim based on the Defendants' emerging pattern of experiencing difficulty securing IV access is not barred by the statute of limitations. The Court now turns to the merits of this claim.

**B.     Eighth Amendment Claim**

The U.S. Supreme Court's decision in *Glossip v. Gross*, 576 U.S. 863, 877 (2015), sets forth the relevant two-pronged standard Barber must meet to succeed on his Eighth Amendment lethal injection method-of-execution claim.

First, Barber must establish that execution by lethal injection presents a risk that is "'*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers.'" *Id.* (emphasis in original) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion); *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)).  In *Baze*, the Court noted that the simple fact that "an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" punishment prohibited by the Eighth Amendment. *Baze*, 553 U.S. at 50.  Thus, Barber must show a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (citing *Baze*, 553 U.S. at 50, quoting *Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994)).

Second, Barber must also "identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 52).  Barber has successfully identified nitrogen hypoxia as a feasible, readily implemented alternative method of execution. *See Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1326–28 (11th Cir. 2019), *cert. denied sub nom. Price v. Dunn*, 139 S. Ct. 1542 (2019).

Having satisfied the second prong of the standard, Barber argues that he has likewise satisfied his burden of showing that he is sure or very likely to experience needless suffering because the IV team is incapable of establishing the venous access necessary to carry out an execution by lethal injection.  The Eleventh Circuit has recognized concerns

surrounding the ADOC's recent difficulties establishing IV access in execution attempts. In *Smith*, the plaintiff made a constitutional challenge to Alabama's lethal injection method of execution. *Smith*, 2022 WL 17069492, at *5.  After the district court dismissed Smith's complaint, he requested leave to amend. *Id.* at *2.  Smith's proposed amended complaint alleged that he would likely suffer an Eighth Amendment violation because Alabama's "Execution Protocol does not expressly prevent the hours-long attempt to establish intravenous access that allegedly resulted in superadded pain during James's execution and Miller's attempted execution." *Id.* at *3.  Smith argued that the ADOC would likely have difficulty accessing his veins because anxiety surrounding an impending execution may constrict blood vessels in an inmate, making them more difficult to access. *Id.* at *5.  Additionally, Smith alleged that his recent medication for depression and insomnia, as well as his borderline obesity, would increase the risk that the ADOC may struggle to access his veins. *Id.*

The Eleventh Circuit panel determined that Smith's allegations "show[ed] a pattern of difficulty by ADOC in achieving IV access with prolonged attempts." *Id.* at *4.  Taking this pattern in conjunction with Smith's alleged specific risk factors, the Circuit held that Smith "plausibly pleaded that . . . he will face superadded pain as the execution team attempts to gain IV access." *Id.* at *5.  Thus, the Circuit determined the district court erred in denying Smith leave to amend his complaint. *Id.* at *6.  In rejecting the ADOC's statute of limitations argument, the Circuit noted that Smith's claim accrued at the ADOC's emergent "pattern of superadding pain through protracted efforts to establish IV access." *Id.* at *5.

However, the Eleventh Circuit has also rejected Eighth Amendment claims based on allegations that an execution will involve futile attempts to locate a vein when the plaintiff has not established a pattern of that particular conduct.  In *Nance*, the plaintiff sought to enjoin the State of Georgia from executing him by lethal injection. *Nance*, 59 F. 4th at 1152.  Nance made an as-applied challenge to Georgia's execution protocol on the basis that his veins were "severely compromised." *Id.*  Accordingly, Nance alleged that he would experience excruciating pain when medical personnel "repeatedly attempt[] to insert needles into unidentifiable and/or inaccessible veins." *Id.* at 1156.  The district court rejected this argument and found that Nance did not have a basis for asserting that the State would subject him to excruciating pain through fruitless and repeated efforts to locate a vein. *Id.*  Although the Eleventh Circuit held that Nance stated a claim on other grounds, it noted that the district court correctly rejected his argument that the State "would subject him to an unconstitutional level of pain by repeatedly pricking him with a needle." *Id.* at 1157.  The Circuit reasoned that Nance did not plausibly allege that futile attempts to locate a vein "would give rise to a constitutionally intolerable level of pain," further noting that "the Eighth Amendment does not guarantee a prisoner a painless death." *Id.* (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019)).

Here, because Barber is scheduled to be executed by Alabama, he urges the Court to follow *Smith*, a case which arose under Alabama's execution protocol.  Barber argues that the attempt to execute Smith further repeated the ADOC's alleged pattern of superadding pain through extended efforts to establish IV access.  However, Barber's circumstances differ from Smith's in key respects.  First, in Barber's case, intervening

actions have disrupted the pattern discussed in *Smith*.  After the ADOC's unsuccessful attempt to execute Smith, it conducted an investigation into its execution procedures. Following the conclusion of this investigation, the ADOC implemented personnel changes to the IV team with personal oversight from Warden Raybon.  None of the members of the current IV team were involved in the previous three execution attempts.  The Defendants have also represented that the investigation did not find any deficiencies in the protocol itself.

Barber cannot show that the investigation and corresponding changes will not address the pattern of prolonged efforts to obtain IV access detailed in *Smith*.  Rather, Barber challenges the sufficiency of the ADOC's investigation because it was conducted internally and, in his opinion, too quickly.  In support of this argument, Barber points to external execution protocol investigations conducted by other states over greater spans of time.  However, Barber's arguments hinge on what he views as "best practices," not what is mandated under the U.S. Constitution.  In this case, the ADOC's investigation and the corresponding changes were designed to address the issues seen in the previous three execution attempts and demonstrate an attempt to remedy the emergent pattern recognized in *Smith*.

Barber is further unlike the plaintiff in *Smith* because he does not allege in his complaint that individual risk factors increase the likelihood that he will face prolonged efforts to establish IV access.  While Smith alleged medical conditions that increased his personal risk for difficult IV access, Barber makes no allegation in his complaint that he has a specific, physical condition or infirmity that makes it more difficult to access his

veins.  At the evidentiary hearing, Barber testified that medical personnel within the ADOC have experienced difficulty accessing his veins on a few occasions.  Barber recounted one experience where a clinician made approximately eight unsuccessful attempts to access his veins in an effort to draw blood.  However, Barber did not express that these difficulties were related to a medical condition, and Barber also testified that medical personnel have accessed his veins without issues in other instances.  This testimony is insufficient to establish that Barber presents the individual risks, which were present in *Smith*, that would complicate establishing IV access in his case.

With the ADOC's investigation interrupting the emergent pattern seen in recent execution attempts, Barber's argument more closely resembles that which was rejected by the Eleventh Circuit in *Nance*.  As *Nance* involved an execution by lethal injection to be conducted by the State of Georgia, the plaintiff in *Nance* did not face the risks contemplated in *Smith*.  Against that backdrop, which is similar to Barber's present circumstances, the Circuit rejected Nance's argument that futile attempts to locate his veins would lead to constitutionally impermissible levels of pain.

To address the medical aspects of his claim, Barber presented Lynn Hadaway ("Hadaway") as an expert witness at the evidentiary hearing.  Hadaway has been a registered nurse for over fifty years and holds board certification from the Infusion Nurses Certification Corporation.  Hadaway testified that on average, it takes a skilled medical professional between six and nine minutes to establish peripheral IV access.[6]  Hadaway

---

[6]  A peripheral IV involves gaining venous access to the peripheral extremities, such as the arms, hands, feet, or legs.

acknowledged that IV access may take longer if the patient is in restraints but testified that a difficult IV should take no longer than thirty minutes. Hadaway testified that she has never seen a case where it took between ninety minutes and three hours to set a peripheral IV. In her opinion, a person who has been punctured with needles for that length of time has been subjected to unnecessary pain.

Hadaway also testified that the standard practice in the medical community is to follow the "two-stick" approach. Under this approach, the medical professional seeking IV access should make only two attempts with a needle to start a peripheral IV. If the medical professional cannot establish IV access after two attempts, then a more skilled professional should attempt to set the IV or vascular visualization technology, such as an ultrasound, should be used to assist in locating a vein.[7] Hadaway testified that subcutaneous probing from repeated efforts to locate a vein increases the likelihood that the needle contacts a nerve, causing tingling or burning pain.

Hadaway's testimony, however, does not establish that efforts to locate Barber's veins would cause him constitutionally impermissible pain. Here, Barber's claim is weaker than the plaintiff's claim in *Nance*, as Barber does not allege a condition with his veins that would complicate IV access. Further, Hadaway's own testimony about the two-stick approach contemplates situations in which multiple attempts to set an IV are medically

---

[7] In support of his motion, Barber also offers the affidavit of certified surgical nurse, Lisa St. Charles. She stated that, in her experience, a more skilled person should be called in to set an IV after three unsuccessful needle sticks. (Doc. 25-2 at 3–4, para. 11).

necessary.  Thus, repeated attempts to set an IV, which may cause pain, do not necessarily constitute "needless suffering" under the Constitution.

The Court finds that Barber fails to demonstrate, on this record, that he is substantially likely to succeed on the merits of his claim that his execution by lethal injection violates the Eighth Amendment.  An allegation of *some* risk alone fails to meet the Supreme Court's high standard; "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50.  Indeed, as the Supreme Court noted in *Bucklew*, "[t]he Constitution allows capital punishment" and "does not guarantee a prisoner a painless death—something that, of course, isn't guaranteed to many people, including most victims of capital crimes." 139 S. Ct. at 1124 (referencing *Glossip*, 576 U.S. at 869).

At the evidentiary hearing, Barber suggested that the Defendants are violating their execution protocol—which provides that the IV team will first try the standard procedure to access a vein—because the Defendants clarified in an interrogatory that the standard procedure is the ordinary procedure that medical professionals follow in setting IV lines. Given that medical professionals follow a two-stick limit, Barber argues, the Defendants are violating their own procedures by making more than two needle sticks over an extended period of time.  However, this argument misconstrues the two-stick limit to which Hadaway testified.  Hadaway did not testify that a maximum of two needle sticks could be made before efforts at IV access are abandoned; rather, Hadaway testified that medical personnel should seek a more skilled clinician or more effective technology if the two-stick

limit is reached.  Thus, the Court does not find Barber's argument that the Defendants have violated their own protocol compelling.

Barber also cites to the memorandum opinion and order in *Smith v. Hamm*, 2023 WL 4353143 (M.D. Ala. July 5, 2023), as supplemental authority, presumably for his motion for preliminary injunction. (Docs. 48, 48-1).  Barber points out that the district court, on remand, in denying in part the defendants' motion to dismiss, found that Smith asserted a plausible Eighth Amendment claim. *Smith*, 2023 WL 4353143 at *9.  Barber provides no analysis of the case, meaningful or otherwise.  This Court, however, undertook an analysis of the case and finds it distinguishable.  First, the opinion is on a motion to dismiss, where the standard is different than the standard on a motion for preliminary injunction.  On a motion to dismiss, the well-pled allegations in the complaint are accepted as true, and courts generally cannot consider extrinsic evidence.  Not so on a motion for preliminary injunction.   While "the well-pleaded allegations [in a] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true," the "court may also consider supplemental evidence, even hearsay evidence, submitted by the parties." *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021) (citations and quotations omitted).  Further, the court in *Smith* noted that "Smith does not claim that the use of needles to establish venous access is per se cruel and unusual punishment." *Smith*, 2023 WL 4353143 at *7.  Rather,

> Smith claims that a second attempt to execute him by lethal injection would amount to cruel and unusual punishment given the extreme pain and suffering he says he experienced during the first execution attempt, along with the State's prior unsuccessful attempt to execute Alan Miller in September

> 2022 and the alleged problems with the State's execution of
> Joe Nathan James in July 2022; and the absence of allegations
> that the State has made changes to its execution procedures,
> aside from the public assertion of a 'top-to-bottom review of
> the protocol.

*Id.*  The court went on to note: "[a]dditional factual development may reveal that what Smith experienced is unlikely to recur because of, for example, changes made as a result of the 'top-to-bottom review' of Alabama's execution protocol." *Id.*

This Court has before it evidence that shows an investigation was, in fact, performed by the ADOC regarding its execution protocols and procedures after the attempted execution of Smith.  Barber argues that this investigation was too brief, perfunctory, and should have been performed by an independent investigatory body.  Notwithstanding Barber's allegations to the contrary, there is evidence before the Court that changes were made to the lethal injection procedures as a result of the investigation, namely, a longer time frame for the execution set by the Governor and a new IV Team consisting of individuals who did not participate in any prior execution or execution attempt.  These intervening actions cut off the emerging pattern of past practices that could have elevated Barber's claims from purely speculative to actionable.  In light of the investigation conducted by the ADOC, and actions taken as a result thereof, the Court finds Barber's allegations are too speculative to give rise to an Eighth Amendment claim upon which he is substantially likely to prevail.

"Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam).  Because Barber

has not shown a substantial likelihood of success on the merits of his Eighth Amendment claim, he has not met his burden of establishing his right to a preliminary injunction. Because this failure is dispositive, the Court pretermits discussion of the other three requirements to warrant a preliminary injunction.[8]

## VI.  CONCLUSION

Accordingly, and for good cause, it is

ORDERED that Barber's motion for preliminary injunction (doc. 25) is DENIED.

DONE this 7th day of July, 2023.

                     /s/ Emily C. Marks

                EMILY C. MARKS

                CHIEF UNITED STATES DISTRICT JUDGE

---

[8] Notwithstanding the Court's rulings as to certain aspects of Barber's claims being barred by the statute of limitations, those claims, had they not been time-barred, would also fail on the merits for the reasons set forth above.